```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - x
                                     :
UNITED STATES OF AMERICA             :
                                     :
        - v. -                       :
                                     :   16 Cr. 256 (KMW)
                                     :
CURTIS WILLIAMS,                     :   OPINION & ORDER
                                     :
                Defendant.           :
- - - - - - - - - - - - - - - - - - x
```

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10/18/16

KIMBA M. WOOD, U.S.D.J.:

   Defendant Curtis Williams ("Williams") is charged with conspiracy to possess and distribute 280 grams or more of mixtures and substances containing crack cocaine, in violation of 21 U.S.C. §§ 846 and 841(a)(1). He is also charged with discharging and brandishing firearms in furtherance of drug trafficking, in violation of 18 U.S.C. § 924(c); trafficking firearms, in violation of 18 U.S.C. § 922(a); and prostitution-related offenses, in violation of 18 U.S.C §§ 2242(a), 1952(a), and 371.

   Williams moves to suppress the 280 mg of crack cocaine seized from him on the evening of his arrest, on the ground that the New

1

York City Police Department ("N.Y.P.D") officers who stopped Williams did so in violation of his Fourth Amendment rights as outlined in Terry v. Ohio, 392 U.S. 1 (1968). For the following reasons, the Court finds that the stop and search did not violate the Fourth Amendment, and therefore DENIES Williams' motion to suppress the evidence.

I.   BACKGROUND

A.   Facts[1]

   a.   The Initial Stop of Curtis Williams

On the evening of March 29, 2016, Curtis Williams was arrested for trespass and possession of a controlled substance following an encounter with officers of the New York City Police Department at 1930 Anthony Avenue in the Bronx, New York. That evening, Officer Dilma Marte, Sergeant Frank Bohr, and Lieutenant Christopher LaGrasta had been conducting a routine patrol of the 46th precinct, which includes 1930 Anthony Avenue. (Evid. Hrg. Tr.

---

[1] The following facts are derived from the evidentiary hearing held by the Court on September 22 and 23, 2016, as well as the submissions filed by both parties. Unless otherwise noted, Williams does not contest the facts as described here.

2

65). Marte and LaGrasta were in uniform; Sergeant Bohr wore plainclothes. Id. at 66. During their patrol, they encountered Williams exiting an apartment building located at 1930 Anthony Avenue. Id.

Both Sergeant Bohr and Officer Marte were familiar with Williams as a result of having conducted numerous patrols in the area. Id. Based on prior interactions with Williams, including prior arrests, they believed that he did not live in the building. Id. at 67-68. In the past Marte had observed Williams frequently entering and exiting another building, 1911 Anthony Avenue. Id. at 65. She believed this to be his place of residence. Id.

Officer Marte approached the defendant as he was exiting 1930 Anthony Avenue. Id. When she asked what he had been doing in the building, he responded that he lived in Apartment 5-C. Id. When she asked if Williams had identification, Williams responded that he did not. Id. at 68. When Marte asked Williams if anyone in unit 5-C would confirm that he lived there, he remained silent. Id. Based on this interaction, Marte concluded that Williams was not telling the truth. Id. She then directed Williams to place his hands on the police vehicle. At this time, Officer Marte

patted Williams down to search for weapons. Id. at 69. Officer Marte uncovered no contraband during her initial frisk. Id.

Officer Marte concluded that Williams was in violation of New York State trespass law. Id. Had he had identification, Marte could have simply issued him a summons. However, because he had no identification, the officers could not verify his pedigree information on the spot. Id. at 70. Officer Marte testified at the evidentiary hearing following defendant's motion that the officers were thus obligated to take Mr. Williams back to the Precinct in order to issue him a summons for trespassing. Id.

### b.   The Second Stop and Arrest of Curtis Williams

Officer Madden arrived to the scene shortly after this exchange between the defendant and Officer Marte. Id. He immediately learned that Williams had been questioned on suspicion of trespass, and that Williams possessed no identification. Id. Officer Madden had also been informed earlier that day from a confidential source that Williams had been selling crack cocaine near 1930 Anthony Avenue. Id. at 89-90. This source had provided the N.Y.P.D. with information about the

defendant in the past. Id. Officer Madden knew this source to be reliable. Id.

Officer Madden had also interacted with Williams on previous occasions, including assisting in a previous arrest of Williams. Id. at 89. In addition to his own interactions with the defendant, Officer Madden, along with Officer Marte and Sergeant Bohr, knew that a search warrant had been executed at 1930 Anthony Avenue, Apartment 5-C, a few months earlier. Id. at 93. During that search of Apartment 5-C, the police seized narcotics and multiple firearms. Id. at 68. In executing the warrant they also came to know who resided in Apartment 5-C. Id. Williams was not one of its residents. Id.

Equipped with this information, Officer Madden questioned Williams further. Williams reiterated that he lived in Apartment 5-C, and that he could not produce identification. Believing Williams' statements to be false, Officer Madden shared Officer Marte's suspicion that the defendant had been trespassing. He then proceeded to frisk Williams. Id. at 94. In patting down Williams' front pants pocket, he felt an abnormally-shaped object. Id. at 96. Officer Madden asked the defendant what he had in his front pocket. Id. Williams responded that he was carrying

5

"work," which the officer knew to mean drugs. Id. He then arrested Williams and drove him back to the 46th Precinct. Id. Madden seized several small bags of crack cocaine from the defendant's person upon arrival at the Precinct. Id. at 97.

After arresting Williams, Officer Madden questioned the residents of Apartment 5-C about whether Williams lived in the unit. Id. at 100. One resident indicated that although Mr. Williams did not live in the building, he did permit Williams to use the shower in Apartment 5-C from time to time. Id. at 101. Williams did not offer this information at the time of his arrest. The resident of Apartment 5-C told Officer Madden that he had seen Williams "earlier that day or the day before," but that Williams had not been in Apartment 5-C near the time of his arrest. Id. at 101. The resident could not recall precisely when he had last seen the defendant. Id.

## II. Discussion

Williams contends that the Officers' stop and frisk, as well as his subsequent arrest, violated his Fourth Amendment rights as outlined in Terry v. Ohio, 392 U.S. 1 (1968). Specifically, he argues that the police did not have reasonable suspicion to

suspect him of trespass in the two instances when he was frisked by Officers Marte and Madden. The Government claims that the information they had at the time Williams was stopped amounted to reasonable suspicion of criminal activity that satisfied the test outlined in Terry v Ohio.

## A. Applicable Law

### a. The Fourth Amendment and Reasonable Suspicion

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Warrantless searches and seizures are "per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 356 (1967). Generally, police may conduct a warrantless seizure only when they have a reasonable suspicion that criminal activity is occurring or imminent. See Terry, 392 U.S. at 30.

While reasonable suspicion "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at

7

least a minimal level of objective justification for making the stop." Ligon v. City of New York, 925 F. Supp. 2d 478, 489 (S.D.N.Y. 2013). The precise combination and strength of evidence necessary to amount to reasonable suspicion is very fact-based. Courts agree that reasonable suspicion requires more than an "inarticulate hunch." Terry v. Ohio, 392 U.S. 1, 22 (1968). Similarly, it is clear that "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." Illinois v. Wardlow, 528 U.S. 119, 124 (1979).

To have reasonable suspicion, the officer must be able to point to "specific and articulable facts which reasonably warrant the intrusion on a citizen's liberty interest." United States v. Elmore, 482 F.3d 172, 178-79 (2d Cir.2007). A trespass-related *Terry* stop must be predicated on specific facts that objectively indicate that an individual might be trespassing. Although that information must be objectively indicative of criminal activity, a police officer is allowed to make inferences that an ordinary person could not; he is entitled to draw on his own experience and specialized training to make deductions that might well elude

8

the average person. United States v. Bert, 814 F.3d 70, 77 (2d Cir. 2016).

Once an officer has conducted a valid Terry stop, he is permitted to search the subject if he has "reason to believe that he is dealing with an armed and dangerous individual." Terry, 392 U.S. at 27. Officers are permitted to conduct these searches for the limited purpose of their own protection and safety. Ybarra v. Illinois, 444 U.S. 85, 93 (1979). The officer need not be certain that the individual is carrying a weapon; a reasonable belief that the subject may be armed is justification enough for a frisk. United States v. Bailey, 743 F.3d 322, 332 (2d Cir. 2014).

### b. New York Trespass Law

Under New York law, a person has committed criminal trespass in the second degree when he "knowingly enters or remains unlawfully in a dwelling" Penal Law § 140.15(1). A person "enters or remains unlawfully" in a dwelling "when he is not licensed or privileged to do so" (Penal Law § 140.00[5]). New York courts have held that a person is "licensed or privileged to enter private premises when he has obtained the consent of the owner or another whose relationship to the premises gives him authority to issue such consent" People v. Graves, 76 N.Y.2d 16, 20, (1990).

### c. Reasonable Suspicion of Trespass

Courts have laid out a few general boundaries for how to evaluate what could (or what does not) constitute reasonable suspicion of criminal trespass. This Court in particular had occasion to examine the standard required for reasonable suspicion of trespass in Ligon v. City of New York, 925 F.Supp.2d. 478 (S.D.N.Y 2013). In Ligon, Judge Schiendlin held that "[a]n individual merely observed exiting or entering and exiting a frequently-patrolled building does not establish reasonable suspicion of trespass, even if the building is located in a high crime area, and regardless of the time of day." Ligon at 543. In addition, when a stopped individual immediately communicates a legitimate reason for being in the building (and the police have no cause to question the veracity of the individual's statement), this Court has declined to find reasonable suspicion. Ligon at 495.[22]

---

[22] In Ligon, Judge Schiendlin reviewed various fact patterns in which individuals were stopped leaving New York City apartment buildings in determining whether the N.Y.P.D. had reasonable suspicion in each individual case. The facts of the scenario cited above are as follows: "On January 5, 2011 the defendants were observed exiting a [C]lean [H]alls building. The defendants

The Second Circuit recently examined (albeit under narrow, fact-based circumstances) what can constitute reasonable suspicion of criminal trespass. In United States v. Bert, it noted that the police had reasonable suspicion of trespass when "the officers were specifically directed to a location where trespassers could be found . . . [defendant] was found at that location, and [defendant] admitted he did not live in the building." 814 F.3d 70, 77-78 (2d Cir. 2016).

## III. Analysis

None of the fact patterns cited above is dispositive in determining whether Officers Marte and Madden had a reasonable suspicion that Williams was trespassing. Three key pieces of evidence lead to the conclusion that the officers conducted a valid trespass stop and search of the defendant.

First, the officers acted on reliable knowledge that Williams did not live at 1930 Anthony Avenue. The N.Y.P.D. personnel

---

stated they were there to visit a tenant in the building. After being arrested[,] a tenant from the building did corroborate the defendant[s'] statements and the tenant stated that both defendants were in the building as his guests." Ligon at 495.

11

involved in the arrest had significant experience patrolling and interacting with residents of the 46th Precinct. On numerous occasions, the officers had seen the defendant entering and exiting a different building, 1911 Anthony Avenue. These sightings allowed them to reasonably conclude that he did <u>not</u> live at 1930 Anthony Avenue. This distinguishes the defendant's case from the scenarios described in <u>Ligon</u>, where the police sometimes stopped individuals for trespass with no legitimate basis for knowing whether or not they lived in the building.

Second, the Officers acted on reliable knowledge that Williams was engaged in the sale of illegal drugs on the day of his arrest. In his testimony at an evidentiary hearing on September 23, 2016, Officer Madden stated that he had received information on the defendant's sale of drugs earlier that morning from a police informant. (Evid. Hrg. Tr. 90). This individual had provided the N.Y.P.D. with reliable evidence of criminal activity in a number of past instances. Id. On one prior occasion, he had even provided accurate information about Mr. Williams' involvement in a neighborhood assault. <u>Id</u>. Officer Madden was thus reasonable in believing the information to be true. The Officer's decision to act on such knowledge gets to

12

the heart of why the Supreme Court has permitted Terry stops at all; to allow for police action when an officer reasonably believes that "criminal activity may be afoot." Terry v. Ohio, 392 U.S 1, 30 (1968).

Third, Curtis Williams was not truthful in his first interaction with the police. He told Officer Marte that he lived in apartment 5-C. When pressed more than once about his place of residence, Williams continued to maintain that he lived there. When asked by Officer Marte if the residents of 5-C would confirm that lived here, Williams remained silent. Given this behavior, and the officer's reasonable belief that Williams did not in fact reside in the building, they were rightly suspicious that he was trespassing.

While the officers were by no means certain that the defendant was armed and dangerous, they did also have a reliable suspicion that Williams might have been carrying a weapon. Officer Madden reasonably believed that Williams had been engaging in the sale of illegal narcotics. Williams also claimed to have been coming from an apartment known to be associated with criminal activity, from which drugs and illegal firearms had been seized just a few months before. The totality of this

information renders a frisk of the defendant subsequent to his stop justified.

Unbeknownst to the N.Y.P.D. at the time of his stop, Williams might well have had permission to use Apartment 5-C's shower that day. Officer Madden learned this only after the defendant's arrest, when he spoke with the residents of 5-C. But the fact that Williams was not forthcoming with the police is significant. Had Williams clearly communicated at the outset that he was permitted to be in unit 5-C, the N.Y.P.D. would not have had reasonable suspicion to stop and search him without more information.

In assessing whether the police conducted a proper Terry stop, what matters is whether the officers formed a reasonable, good faith opinion at the time of the stop that there was likely criminal activity; not whether they were certainly or ultimately correct. "A determination that reasonable suspicion exists need not rule out the possibility of innocent conduct." United States v. Arvizu, 534 U.S. 266, 277 (2002).

Thus, even if Williams committed no crime up until the point when the drugs were found on his person, the dispositive question is whether the information available to the police, in

14

the aggregate, rose to the level of reasonable suspicion. The Court finds that it did.

### IV. Conclusion

For the foregoing reasons, the defendant's motion to suppress is DENIED.

SO ORDERED.

DATED:   New York, New York
         October 18, 2016

*/s/ Kimba M. Wood*
KIMBA M. WOOD
United States District Judge